**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| MATRIX NORTH AMERICAN CONSTRUCTION, INC., | |
| Plaintiff, | |
| v. | No.: |
| ADVANTAGE INDUSTRIAL SYSTEMS, LLC; STEVEN HARKER II; BILL SULLIVAN; RYAN CHANDLER; and THOMAS HOWARD, | JURY DEMAND |
| Defendants. | |

## COMPLAINT

As and for its Complaint against Defendants Advantage Industrial Systems, LLC ("AIS"), Steven Harker II ("Harker"), Bill Sullivan ("Sullivan"), Ryan Chandler ("Chandler") and Thomas Howard ("Howard"), collectively referred to as "Defendants," Plaintiff Matrix North American Construction, Inc. ("Matrix") states and alleges as follows:

## NATURE OF THE ACTION

1.     This is an action for breach of fiduciary duty, misappropriation of trade secrets, violations of the Computer Fraud and Abuse Act, breach of contract and unfair competition.

2.     Recently, Matrix has discovered that AIS conspired with Matrix employees and former employees in an effort to cannibalize Matrix's steel maintenance business and unfairly compete in the capital construction business.

3.     AIS, through its co-conspirators, on information and belief, orchestrated the mass theft of a litany of Matrix's confidential information and trade secrets.  These actions were undertaken through unlawful means, including through conduct that exceeded Defendants'

authorized access to Matrix's computer systems or otherwise accessed its computer systems without authorization.

4.     The conduct of these Matrix employees and former employees, with AIS' support and assistance, included, on information and belief, organizing a mass exodus of employees from Matrix over a short period of time to work for AIS, thus depriving Matrix of a workforce to continue its steel maintenance business operations, theft of confidential information and trade secrets and exceeding Defendants' authorized access to Matrix's computer systems or otherwise accessing its computer systems without authorization.

5.     The actions taken by Matrix's employees and former employees not only breached their fiduciary duties to Matrix, but also violated valid and enforceable contracts entered into by those employees governing the use and disclosure of Matrix's confidential information and trade secrets.

6.     AIS and the other Defendants engaged in this conduct, on information and belief, in order to:  (i) unfairly take advantage of Matrix's planned exit from a portion of its steel business, thus depriving Matrix of the profits it intended to earn from its orderly exit from the steel maintenance business; (ii) allow AIS to immediately commence work in the steel industry at a level commensurate with Matrix's skill and experience by relying on Matrix's stolen confidential information and trade secrets; and (iii) allow AIS to compete with Matrix in the capital construction portion of the steel business.

7.     Despite Matrix's efforts to amicably resolve this matter short of litigation, AIS' continued misconduct, through its agents, demonstrates that the wrongdoers have no intention of ceasing their unlawful conduct.

**THE PARTIES**

8.      Matrix is an Oklahoma corporation with its principal place of business in Tulsa, Oklahoma.

9.      On information and belief, AIS is an Illinois corporation with its principal place of business at 9320 Corsair Rd., Frankfort, IL 60423.

10.     Harker is an individual who, on information and belief, resides at 1418 Prestwick Drive, Schererville, IN 46375.

11.     Sullivan is an individual who, on information and belief, resides at 8245 E. 96th Ct., Crown Point, IN 46307.

12.     Howard is an individual who, on information and belief, resides at 600 Campbell St., Valparaiso, IN 46385.

13.     Chandler is an individual who, on information and belief, resides at 307 S. State Road 2, Hebron, IN 46341.

**JURISDICTION AND VENUE**

14.     Jurisdiction is proper pursuant to 28 U.S.C. § 1331 because Plaintiff's claims under the Defend Trade Secrets Act ("DTSA") and the Computer Fraud and Abuse Act ("CFAA") constitute federal questions.  This Court may exercise supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to claims in this action with original jurisdiction that they form part of the same case or controversy.

15.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because AIS regularly conducts business in this district and because a substantial part of the events giving rise to the below causes of action occurred in this district.

16.     This Court has personal jurisdiction over AIS, Chandler, Sullivan, Harker and Howard because Defendants regularly conduct business in Indiana and Harker, Chandler, Sullivan and Howard reside in Indiana.

## FACTUAL BACKGROUND

### —MATRIX'S BUSINESS—

17.     Since 1986, Matrix has provided procurement, construction, maintenance and repair services to the energy and industrial markets across North America.

18.     Matrix enjoys a long-standing reputation for excellence across a host of services including large capital construction, oil and gas storage, power generation, power delivery, integrated iron and steel, and refinery and petrochemical work.

19.     Matrix has a long history of performing both maintenance and repair work as well as capital construction.  This work consists of, but is not limited to, Ironworker, Boilermaker, Pipefitter, Bricklayer, Laborer, and other various support craft for both repair and new installation work.

20.     Matrix's steel industry business ("Steel Business") consists of two categories:  (1) steel maintenance ("Steel Maintenance") and (2) capital construction ("Capital Construction").

21.     Steel Maintenance consists of day-to-day maintenance at a customer's facility, including emergency repairs and surge maintenance and also some planned maintenance.  Steel Maintenance generally consists of smaller jobs that are billed on a time-and-material basis and are lower in total dollar value.

22.     Capital Construction consists of larger projects that often solicit bids from multiple companies.  These projects are typically higher in value and also include the use of

more creative contracting strategies, such as lump-sum proposals and fixed-fee/reimbursable proposals.

23.     Three of Matrix's larger Steel Business accounts were located in Indiana; namely U.S. Steel's largest manufacturing plant, Gary Works, as well as ArcelorMittal's facilities at Burns Harbor and Indiana Harbor.  Matrix also performed work for U.S. Steel in Pennsylvania.

24.     In or around November 2019, Matrix had a dispute with U.S. Steel, which threatened its Steel Maintenance business relationship.

25.     On February 5, 2020, based in part on its dispute with U.S. Steel, Matrix announced that it would be exiting the Steel Maintenance portion of its business.  Matrix continues to work in the Capital Construction portion of its Steel Business.

26.     With ongoing jobs to complete and customer relationships to maintain, Matrix wished to exit this portion of its business in an orderly and as profitable a manner as possible.

27.     Defendants' actions, as described below, have unlawfully interfered with and severely damaged Matrix's efforts to do so.

— MATRIX'S CONFIDENTIAL INFORMATION AND TRADE SECRETS—

28.     The nature of Matrix's Steel Business leads to the development of confidential information and trade secrets, which allow Matrix to gain a competitive advantage in the industry.

29.     Among those trade secrets are Matrix's pricing and bidding information, which provide Matrix's margins, its mix of labor components and other strategic information.  Bidding and pricing information apply to both the Steel Maintenance and Capital Construction portions of Matrix's Steel Business.

30.     In addition to the pricing information, Matrix's proposals contain, among other things, means and methods for the work, schedules and duration, and proposed manpower and staffing.  All of this information has been developed over time by Matrix at Matrix's substantial expense.

31.     As a contractor, Matrix has developed its margins, proposals and bidding strategy over time, and uses that information to gain a competitive advantage in the industry.  This information is contained on Matrix's rate sheets, bid sheets and estimates (collectively, "Rate Sheets").

32.     Rate Sheets are critical components of Matrix's business.  In the industry, all competitors work off of the same union labor rates.  Thus, the mark-up that a company uses (payroll burdens, insurance, small tools and consumable rates, and overhead and profit) is the critical component to winning projects from customers.

33.     Rate Sheets contain the information about Matrix's mark-ups that it uses when bidding on projects.

34.     Matrix has spent years developing its Rate Sheets for the Steel Business and considers them to be trade secrets.  Consistent with their importance and secrecy, only certain employees have access to Rate Sheets.  Those include site managers, estimators and certain management personnel.  Rate Sheets are stored on secure shared drive that is accessible only if Matrix grants the employee access.  Access to this drive is granted only when the employee has a business need for the information.

35.     Matrix has also developed, or acquired through acquisition, many proprietary forms, work processes and operating procedures in its handbook of operations.

36.     For example, Matrix acquired a large number of forms through its acquisition of Kvaerner Sogner, Inc.  The goodwill, which included these forms, was valued at $13.6 million.

37.     The forms were stored in Matrix's Business Management folder and many of them were marked as "Confidential."  Matrix considered these forms the confidential property of Matrix.

38.     Upon information and belief, AIS has converted many of these documents for its own use.

— Matrix's Protection of its Confidential Information and Trade Secrets—

39.     Matrix's Steel Business relies upon and generates a substantial amount of confidential information and trade secrets.  Matrix goes to great lengths to protect its confidential information and trade secrets.

40.     In addition to limiting the access to various documents, as discussed above, all Matrix employees are required to affirm, acknowledge and comply with confidentiality policies.

41.     The Matrix Employee Handbook states, in part: "[y]ou must maintain the confidentiality of such information entrusted to you by the Company, its customers and its suppliers . . ." and this obligation "continues to apply even after your employment or director relationship with the Company terminates."

42.     The Employee Handbook further states:

Disclosure of the Company's confidential, proprietary and trade secret information without prior authorization is prohibited. Use of the Company's confidential, proprietary and trade secret information for any non-Company purpose is also prohibited.  Specific items and materials which are considered confidential, proprietary, and trade secrets and which may not be disclosed to third-parties include, but are not limited to, standard drawings, technical bulletins, business plans, corporate strategy, assembly/construction methods, procedures, customer and sales data, internal financial information, business methods, sales leads, customer lists, price lists, costs, product design information, contracts, budgets, legal correspondence, design standards, cost books and similar materials.

(A true and correct copy of Matrix's Confidentiality Policy is attached hereto as Exhibit A.)

43.    During their employment, Messrs. Howard and Chandler signed an acknowledgment, agreeing to abide by the Matrix Employee Handbook, which included the above policies governing the use of confidential information and trade secrets.  (True and correct copies of Howard's and Chandler's acknowledgment of the Matrix Employee Handbook are attached hereto as Exhibits B and C.)

44.    In addition to acknowledging the Employee Handbook, Messrs. Chandler and Sullivan also entered into agreements with Matrix governing the use and disclosure of confidential information and trade secrets.

45.    For example, on June 20, 2014, Sullivan entered into a Non-Disclosure and Ownership Agreement with Matrix ("Sullivan Agreement") whereby he agreed to be bound by the "Confidential, Proprietary and Trade Secret Information, Code of Business Conduct and Ethics, and Conflict of Interest policies" in the Employee Handbook.  (A true and correct copy of the Sullivan Agreement is attached hereto as Exhibit D.)

46.    Sullivan entered into the Sullivan Agreement "[i]n consideration for access to Matrix's confidential, proprietary and/or trade secret information, and as a term and condition of [his] continued at-will employment with Matrix."

47.    On February 29, 2016, Chandler entered into a Non-Disclosure and Ownership Agreement with Matrix ("Chandler Agreement") whereby he agreed to be bound by the "Confidential, Proprietary and Trade Secret Information, Code of Business Conduct and Ethics, and Conflict of Interest policies" in the Employee Handbook.  (A true and correct copy of the Chandler Agreement is attached hereto as Exhibit E.)

48.     Chandler entered into the Chandler Agreement "[i]n consideration for access to Matrix's confidential, proprietary and/or trade secret information, and as a term and condition of [his] continued at-will employment with Matrix."

## —AIS' BUSINESS—

49.     AIS is a full service mechanical contractor performing work within a diverse group of industries on both national and international levels.

50.     According to its website, AIS' core competencies include millwright, piping, rigging, steel erection and fabrication services for single projects.

51.     AIS and Matrix directly compete with one another across multiple business lines, including Steel Maintenance.

52.     In fact, on information and belief, AIS is actively trying to obtain work with U.S. Steel and ArcelorMittal, two of Matrix's flagship customers.

53.     On information and belief, AIS is also planning to enter the Capital Construction business.

## —CHANDLER'S, SULLIVAN'S, HOWARD'S AND HARKER'S EMPLOYMENT WITH MATRIX—

54.     Harker is a former employee of Matrix, who left employment with Matrix as a Project Manager on February 28, 2019 to begin working for AIS.

55.     Chandler began working for Matrix on November 12, 2003 as an Ironworker and eventually became a Construction Manager.

56.     In this role, he was responsible for leading Matrix's maintenance operations at the US Steel Gary Works facility.

57.     Sullivan began working for Matrix on January 18, 2010 as an Ironworker and eventually became a Construction Manager.

58.     As a Construction Manager, he was responsible for leading Matrix's maintenance operations at the ArcelorMittal Indiana Harbor facility as well as supporting capital projects, when required.

59.     Howard began working for Matrix on February 3, 2009 as an Ironworker Foreman.

60.     As an Ironworker Foreman, and eventually as a Superintendent, he was responsible for coordinating operations and overseeing workers at the ArcelorMittal Indiana Harbor facility.

61.     On January 4, 2020, Chandler resigned his employment with Matrix and accepted employment with AIS.

62.     On February 14, 2020, Howard resigned his employment with Matrix and accepted employment with AIS.

63.     On February 14, 2020, Sullivan resigned his employment with Matrix and accepted employment with AIS.

64.     Sullivan stated that he was resigning because Matrix had decided to exit the Steel Maintenance business.  Sullivan had began planning his exit from Matrix and his employment with AIS well in advance of Matrix announcing its plan to leave the Steel Maintenance business. Indeed, Sullivan had started planning his exit from Matrix at least as of early January 2020.

65.     On February 14, 2020, Howard resigned his employment with Matrix and accepted employment with AIS.

66.     On information and belief, Chandler, Sullivan and Howard are working in substantially similar capacities for AIS as they did for Matrix.

- 10 -

67.     In addition to Chandler, Sullivan and Howard, upon information and belief, at least 20 other Matrix employees have resigned from Matrix and accepted employment with AIS between December 2019 and the date of this Complaint.

68.     Matrix's Steel Maintenance business was split into two main geographic regions: (1) Indiana; and (2) Pennsylvania.  U.S. Steel operates in both Indiana and Pennsylvania.

69.     Chandler, Sullivan and Howard worked on Matrix's Indiana operations.

70.     Dominic Manfredo ("Manfredo") and John Meyer ("Meyer"), both of whom are discussed below, worked on Matrix's Pennsylvania operations.

71.     On information and belief, AIS used the above employees to steal Matrix's confidential information and trade secrets and interfere with Matrix's employee relationships.

72.     As discussed herein, prior to terminating their employment with Matrix, Howard, Chandler, Sullivan and other Matrix employees engaged in efforts to steal various documents and information from Matrix to benefit AIS.  On information and belief, AIS and Harker subsequently misappropriated and relied upon this information to accelerate Matrix's exit from the Steel Maintenance business to obtain Matrix's Steel Maintenance business through use of Matrix's pricing methodology and other confidential forms.  Matrix is further informed and believes that AIS and Harker plan to use these trade secrets to enter the steel Capital Construction business.

73.     Included in the documents that Chandler, Howard, Sullivan and other employees stole were documents containing Matrix's trade secrets.

74.     On information and belief, Messrs. Chandler, Sullivan and Howard recruited and/or participated in the recruitment of Matrix employees to leave Matrix to work for AIS while still employed by Matrix.

75.     On information and belief, Harker orchestrated the process of getting Messrs. Chandler, Sullivan and Howard and other employees to leave Matrix to work for AIS, on behalf of AIS.

— CHANDLER'S THEFT OF TRADE SECRETS AND BREACH OF FIDUCIARY DUTIES—

76.     In the days leading up to his resignation, Chandler downloaded a large volume of Matrix documents and retained many of these documents following the termination of his employment.   On information and belief, these documents included Matrix's confidential information and trade secrets

77.     The documents Chandler downloaded and stole included information that would benefit AIS' work in the Steel Maintenance business and also allow it to seamlessly enter the steel Capital Construction business by relying on Matrix's work product.

78.     Chandler's actions exceeded his authorized access to Matrix's computer systems by using his access to download and steal Matrix's confidential information and trade secrets.

— SULLIVAN'S THEFT OF TRADE SECRETS AND BREACH OF FIDUCIARY DUTIES—

79.     In the weeks leading up to his resignation, and thereafter, Sullivan forwarded numerous emails containing Matrix bidding information to his personal email.  This information included Rate Sheets, bid sheets, cost analyses, proposals, forms and other information relating to specific Matrix projects.

80.     Like Chandler, these documents included information that would benefit AIS' work in the Steel Maintenance business and also allow it to seamlessly enter the steel Capital Construction business by relying on Matrix's work product.

81.     Not only did Sullivan steal a large volume of confidential information and trade secrets, but he also actively worked to promote AIS' interests – to the detriment of Matrix – while still employed by Matrix.

82.     For example, while still employed by Matrix, Sullivan attempted to redirect ArcelorMittal purchase orders to AIS that had already been issued to Matrix.  These purchase orders were valued at $218,856.00.

83.     To convince ArcelorMittal to cancel the purchase orders and reissue them to AIS, Sullivan falsely represented that Matrix approved of the transfer of the purchase orders.  Matrix neither approved of the transfer nor authorized Sullivan to make such a representation and notified ArcelorMittal of such.

84.     While Matrix attempted to correct this misrepresentation, ArcelorMittal ultimately cancelled the purchase orders and, on information and belief, reissued them to AIS.

— **HOWARD'S THEFT OF TRADE SECRETS AND BREACH OF FIDUCIARY DUTIES**—

85.     Howard has also stolen Matrix's confidential information and trade secrets and engaged in unauthorized access to Matrix's computers.

86.     On February 21, 2020 – a week after ending his employment with Matrix – Howard accessed his Matrix email account and forwarded a master listing of 2,963 Matrix employees, containing various information about each employee.

87.     Matrix considers this document to be a trade secret because Matrix has spent time and money to compile a large amount of confidential information into one location that is otherwise not accessible to the public.  This information includes employee drug testing service numbers, which is a critical piece of information needed for the labor portion of the work Matrix and AIS perform.

88.     As of the date his employment ended, Howard no longer had permission or authority to access Matrix's email server.

89.     On information and belief, Howard stole these documents to use in his future employment with AIS and has relied upon these documents in obtaining business for AIS.

90.     This document would benefit AIS' work in the Steel Maintenance business and also allow it to seamlessly enter the steel Capital Construction business by identifying a pool of competent employees that could perform the work needed and the information for each employee necessary to successfully obtain projects.

91.     Howard's actions which, on information and belief were taken on behalf of and at the direction of AIS, constituted unauthorized access to Matrix's computer systems.

—THEFT OF TRADE SECRETS BY OTHER MATRIX EMPLOYEES—

92.     Other Matrix employees, who are not subject to this Court's jurisdiction, also stole confidential information and trade secrets from Matrix on behalf of and, on information and belief, at the direction of, AIS.

93.     Specifically, in the days leading up to his resignation, Meyer forwarded a large volume of Matrix confidential information and trade secrets to his personal e-mail address. These documents included, but were not limited to, Rate Sheets, bid sheets, cost analyses, proposals, forms and other information relating to specific Matrix projects.

94.     These documents included information that would benefit AIS' work in the Steel Maintenance business and also allow it to seamlessly enter the steel Capital Construction business by relying on Matrix's work product.

95.     For example, on January 7, 2020 – a week before he resigned – Meyer forwarded multiple estimating templates that Matrix uses for the services it performs as well as the Rate

Sheets for the same to his personal email account. These documents constitute highly confidential trade secrets.

96.     The following week, Meyer also forwarded various other information to his personal email account, including certain Matrix forms and other critical business information.

97.     On information and belief, Meyer stole these documents to use in his future employment with AIS and has relied upon these documents in obtaining business for AIS.

98.     Meyer's actions which, on information and belief were taken on behalf of and at the direction of AIS, exceeded Meyer's authorized access to Matrix's computer systems by using his access to download and steal Matrix's confidential information and trade secrets.

99.     Moreover, on January 15, 2020 – after his resignation – Manfredo remotely accessed his Matrix email account and emailed sensitive bid data containing Matrix's pricing information to his personal email account.

100.    In fact, some of the information Manfredo emailed to his personal email account was labeled "Confidential."

101.    The documents Manfredo downloaded and stole include information that would benefit AIS' work in the Steel Maintenance business and also allow it to seamlessly enter the steel Capital Construction business by relying on Matrix's work product.

102.    As of the date his employment ended, Manfredo no longer had permission or authority to access Matrix's email server.

103.    On information and belief, Manfredo stole these documents to use in his future employment with AIS and has relied upon these documents in obtaining business for AIS.

104.    Manfredo's actions which, on information and belief were taken on behalf of and at the direction of AIS, constituted unauthorized access to Matrix's computer systems.

—AIS' Unfair Business Activities—

105.     AIS has obtained an unfair competitive advantage in both the Steel Maintenance and steel Capital Construction business.

106.     Matrix is informed and believes that Harker and AIS targeted Matrix employees to terminate their employment with Matrix and steal Matrix's confidential information and trade secrets.

107.     AIS and Harker's scheme was successful as they convinced at least 20 employees to leave Matrix and work for AIS, and also succeeded in stealing countless Matrix confidential information and trade secrets.

108.     Moreover, Defendants have been using Matrix's confidential information and trade secrets to win business and usurp business that was already awarded to Matrix and that Matrix had every intention of completing.

109.     For example, on January 13, 2020, Manfredo modified Matrix's LR-8 Form (entitled Request for Craft Personnel) for use by AIS.  Not only did this include changing Matrix's name at the top to read AIS, but he also completed the form on behalf of AIS. Manfredo, however, did not do a very good job altering the form as there remain references to Matrix on the newly created AIS form.

110.     Further, on February 13, 2020, Sullivan sent an email to ArcelorMittal – a then-current customer of Matrix – from his Matrix email account, stating:

> Friday is our last day for Matrix. Matrix has decided to pull out of the steel mill business. Myself, Tom Howard, Tom Williamson, Mike Bovenizer, Joe Kolosci, Dan Francis, Otto Hopkins, Thomas Lane (He will mainly be at USS), Blake Riley (MWGF), James McKean (LBGF) are all going to work for Advantage Industrial Systems (AIS). AIS is up to date in the Arcelor System. We have already received PO's and we are ready to go. *Also, AIS T&M rates are lower than Matrix*.

111.    This clearly demonstrates that AIS, through its former Matrix employees, relied upon Matrix's confidential information and trade secrets, particularly its trade secret bidding rates.

112.    While it is true that Matrix was planning to exit the Steel Maintenance business, Matrix was entitled to exit the Steel Maintenance business in as orderly and profitable a manner as possible.  Moreover, Matrix will continue to perform Capital Construction work in its Steel Business, so AIS' reliance upon Matrix's trade secrets to the benefit of AIS and Matrix's detriment is also damaging.

113.    AIS' theft of Matrix's trade secrets and targeted raiding of employees not only unlawfully interfered with Matrix's plan to profitably exit the Steel Maintenance business, but also deprived it of the value these trade secrets lend to its ongoing steel Capital Construction business.

— MATRIX'S EFFORTS TO SECURE DEFENDANTS' COMPLIANCE—

114.    On January 16, 2020, Matrix sent cease and desist letters to Chandler and AIS, demanding that they cease and desist using Matrix's confidential information and trade secrets. (True and correct copies of the January 16, 2020 cease and desist letters are attached hereto as Exhibits F and G.)

115.    Despite Matrix's letters, AIS, through its agents, have continued to engage in efforts to steal Matrix's confidential information and trade secrets and to access Matrix's computers without authorization.

116.    Indeed, as discussed above, Howard accessed Matrix's computer systems without authorization as recently as February 21, 2020.

- 17 -

117.    Similarly, as recently as February 6, 2020, another former employee of Matrix – who is still employed by Matrix – was obtaining quotes for fleet vehicles on behalf of AIS.  In other words, this employee was working on AIS' behalf, while still employed by Matrix.

118.    Moreover, since sending the cease and desist letters, on information and belief, AIS has modified certain forms created by Matrix for use by AIS.  Indeed, on information and belief, AIS made no changes to these forms, other than changing the company name from Matrix to AIS.


## COUNT I – BREACH OF FIDUCIARY DUTY
### (Against Chandler, Sullivan and Howard)

119.    Matrix restates and realleges Paragraphs 1 through 118 as if fully stated herein.

120.    As employees of Matrix, Chandler, Sullivan and Howard owed Matrix a fiduciary duty and a duty of loyalty to act in Matrix's best interests.

121.    By downloading and subsequently stealing Matrix's confidential information while employed by Matrix and, on information and belief, conspiring with AIS to unfairly target the employees of Matrix's steel industry division to Matrix's detriment, Chandler, Sullivan and Howard breached their fiduciary duties to Matrix.

122.    Further, by usurping Matrix's business opportunities, including existing purchase orders, and informing Matrix customers that AIS can provide better pricing than Matrix, while still employed by Matrix, Sullivan further breached his fiduciary duties to Matrix.

123.    As a result of Chandler's, Sullivan's and Howard's breach of their fiduciary duties, Matrix has sustained severe, immediate and irreparable harm, damage and injury, which entitles Matrix to restitution, disgorgement and/or damages.

## COUNT II – VIOLATION OF THE INDIANA UNIFORM TRADE SECRETS ACT
### (Against All Defendants)

124.     Matrix restates and realleges Paragraphs 1 through 118 as if fully stated herein.

125.     Matrix's Confidential Information and Trade Secrets as described herein constitute "trade secrets" within the meaning of the Indiana Uniform Trade Secrets Act, IND. CODE § 24-2-3-2 *et seq.*, because Matrix derives independent economic value from this information, such information is not generally known nor readily ascertainable by proper means by others who could obtain economic value from its disclosure or use, and Matrix has exercised reasonable efforts to maintain the secrecy and confidentiality of such information.

126.     Harker, Chandler, Sullivan and Howard, as agents of, and, on information and belief, at the direction of, AIS, have improperly used, disclosed and/or misappropriated Matrix's confidential information and trade secrets for their own benefit and/or to inflict grave commercial harm on Matrix.

127.     Defendants have been, or will be, unjustly enriched, and Matrix severely harmed, by Defendants' misappropriation and wrongful use and disclosure of Matrix's confidential information and trade secrets.

128.     Defendants' improper actual and threatened future use, disclosure and misappropriation of Matrix's confidential information and trade secrets have been and are deliberate, willful and malicious.

129.     Defendants' past, present and continuing improper threatened use, disclosure and/or misappropriation of Matrix's confidential information and trade secrets have directly and proximately caused Matrix substantial, immediate and irreparable injury to the value of its confidential information and trade secrets and competitive advantage and goodwill, all of which

Matrix has expended significant time, money and effort to develop and secure, and for which Matrix has no adequate remedy at law.

### COUNT III – VIOLATION OF DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836
**(Against All Defendants)**

130.    Matrix restates and realleges Paragraphs 1 through 118 as if fully stated herein.

131.    The actions of Defendants, as described above, constitute violations of one or more provisions of the DTSA.

132.    Matrix's trade secrets are proprietary and confidential to Matrix as described above, and they constitute protectable trade secrets under the DTSA.

133.    The DTSA applies because Matrix's trade secrets are related to pricing and contracting for work that is conducted in interstate commerce, and used for customers located throughout the United States.

134.    By engaging in the above conduct, Harker, Chandler, Sullivan and Howard, for the benefit of AIS, have misappropriated Matrix's trade secrets related to services used in, or intended for use in, interstate commerce.

135.    Matrix has taken reasonable efforts to protect and maintain the secrecy and confidentiality of its trade secrets, including the efforts set forth in Paragraphs 37, 39-48 above.

136.    Matrix's trade secrets are not generally known in the industry in which it operates or to the general public, and their secrecy confers substantial economic advantage and benefit to Matrix.  Knowledge of this information would also confer a substantial economic benefit to Matrix's competitors, including AIS.

137.    The circumstances of Harker's, Chandler, Sullivan's and Howard's employment with Matrix gave rise to fiduciary duties and obligations to maintain the secrecy of Matrix's

trade secrets and to strictly limit the use of such trade secrets to Matrix's business activities and for Matrix's exclusive benefit.

138.    In addition, through their acknowledgment of the Matrix Employee Handbook, which contained confidentiality provisions, Harker, Chandler, Sullivan and Howard were obligated to maintain the secrecy and confidentiality of all of Matrix's confidential information and trade secrets.

139.    Harker, Chandler Sullivan and Howard, as agents of AIS, through improper means and without authorization, acquired Matrix's trade secrets to and for the benefit of themselves, threatened to and/or did disclose and use such trade secrets without Matrix's consent, in order to unfairly compete with Matrix and to poach its customers.

140.    Defendants can derive and have derived economic value from the disclosure and use of Matrix's trade secrets, for example, by avoiding the considerable time, effort and expense it took Matrix to develop its trade secrets and customer relationships, and to convert Matrix's customers for their own financial gain.

141.    As a direct and proximate result of Defendants' deliberate, willful and malicious misappropriation of Matrix's trade secrets, Matrix has sustained and will continue to sustain severe, immediate and irreparable harm, damage and injury to the value of its trade secrets, its competitive advantage and its customer relationships and goodwill, all of which Matrix has expended significant time, effort and money to secure.

## COUNT IV – VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT
### (Against Chandler, Sullivan and Howard)

142.    Matrix restates and realleges Paragraphs 1 through 118 as if fully stated herein.

143.    The CFAA provides a private cause of action against anyone who intentionally accessed a computer without authorization or exceeded his authorized access to obtain information from a protected computer.  *See* 18 U.S.C. § 1030(a)(2)(C).

144.    The CFAA defines a "protected computer" as a computer "which is used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2)(B).

145.    The CFAA allows for a private cause of action if there is a "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i).

146.    Matrix's computers are used in and affect interstate commerce by its offering of its construction services to companies throughout the United States.

147.    In accessing trade secrets, proprietary material and other confidential information for the benefit of AIS and/or other competitors, while still employed by Matrix, Chandler and Sullivan exceeded their authorized access to Matrix's computer systems.

148.    In accessing trade secrets, proprietary material and other confidential information for the benefit of AIS and/or other competitors, after his employment with Matrix ended, Howard engaged in unauthorized access to Matrix's computer systems.

149.    Matrix has suffered — and continues to suffer — losses in excess of $5,000.00 in a one-year period, including, without limitation, the costs of investigating this incident after learning of the various breaches by Chandler, Sullivan and Howard.

150.    As a result of Chandler's, Sullivan's, and Howard's wrongdoings, Matrix has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable injury, for which there is no adequate remedy at law to compensate.

## COUNT V – CONVERSION
### (Against Chandler, Sullivan and Howard)

151.     Matrix restates and realleges Paragraphs 1 through 118 as if fully stated herein.

152.     During their employment with Matrix, Chandler, Sullivan and Howard had access to highly sensitive confidential information and trade secrets.

153.     At all relevant times, Matrix had a legal right to said highly sensitive confidential information and trade secrets and the absolute and unconditional right to immediate possession of said confidential information and trade secrets.

154.     Upon termination of their employment, Chandler, Sullivan and Howard obtained without authorization and retained, among other things, confidential pricing information, data regarding customers and employees, and quotes and proposals.

155.     Chandler, Sullivan and Howard had no legitimate basis to obtain this information and had no authorization from Matrix to do so.

156.     By failing to return this information to Matrix upon their resignation, Chandler, Sullivan and Howard continue to exercise control over this information that is inconsistent with Matrix's right to possession of this information.

157.     As a direct and proximate result of Chandler's, Sullivan's and Howard's theft and retention of this information Matrix has suffered damages.

## COUNT VI – UNFAIR COMPETITION
### (Against AIS)

158.     Matrix restates and realleges Paragraphs 1 through 118 as if fully stated herein.

159.     On information and belief, AIS engaged in a panoply of unfair tactics to compete with Matrix, including:  (i) conspiring with Matrix employees to terminate their employment with Matrix in mass and commence employment with AIS; (ii) accepting and, on information and belief, encouraging, Matrix employees to steal Matrix confidential information and trade

- 23 -

secrets from Matrix and using that confidential information to compete with Matrix; and (iii) allowing individuals employed by Matrix to perform work on AIS' behalf.

160.    These unlawful tactics allowed AIS to secure a competitive advantage over Matrix that AIS would otherwise have been unable to obtain by lawful means.

161.    As a direct, proximate and foreseeable result of Defendants' wrongful conduct alleged herein, Matrix has suffered irreparable injury, including but not limited to wrongful loss of its exclusive use of confidential information and trade secrets and loss of its workforce, for which Matrix's remedy at law is inadequate.

## COUNT VII – BREACH OF CONTRACT
### (Against Chandler and Sullivan)

162.    Matrix restates and realleges Paragraphs 1 through 118 as if fully stated herein.

163.    The Chandler Agreement, including its confidentiality provision, is a valid and legally enforceable contract, ancillary to an employment relationship, supported by adequate consideration and entered into freely and without distress by Chandler.

164.    The Sullivan Agreement, including its confidentiality provision, is a valid and legally enforceable contract, ancillary to an employment relationship, supported by adequate consideration and entered into freely and without distress by Sullivan.

165.    As consideration for these agreements, Chandler and Sullivan received continued employment with Matrix for a substantial period of time and were provided with access to Matrix's confidential information and trade secrets.

166.    Matrix has a legitimate interest in protecting its confidential information and trade secrets.

167.    But for their affiliation with Matrix, Chandler and Sullivan would not have had access to Matrix's confidential information and trade secrets.

168.    Chandler and Sullivan breached their obligations under their respective agreements by stealing Matrix's confidential information and trade secrets and failing to return that information at the time of their resignation from Matrix.

169.    Matrix has been damaged by Chandler's and Sullivan's breaches of their agreements by depriving Matrix of the exclusive use of its confidential information and trade secrets and by allowing a competitor of Matrix to become unjustly enriched through its reliance on such confidential information and trade secrets.

## JURY DEMAND

Matrix requests a trial by jury on all counts.

**WHEREFORE**, Matrix respectfully requests the Court to enter judgment in its favor on Counts I through VII and award the following relief:

   (a)   compensatory, consequential, incidental, punitive and/or special damages, in an amount to be determined at trial;

   (b)   restitution, disgorgement and/or damages as are permitted by law;

   (c)   preliminary and permanent injunctive relief barring Defendants from using or relying upon Matrix's confidential information and trade secrets and otherwise engaging in unfair competition, and ordering Defendants to immediately return any Matrix confidential information and trade secrets in their possession;

   (d)   pre-judgment and post-judgment interest;

   (e)   costs and expenses incurred in pursuing this action, including reasonable attorneys' fees to the extent permitted by law; and

   (f)   such other relief as the Court deems just and proper.

March 6, 2020

Respectfully submitted,

MATRIX NORTH AMERICAN CONSTRUCTION, INC.

By: /s/ *Cara Ottenweller*

Cara Ottenweller (Bar No. 2728049)
VEDDER PRICE P.C.
222 North LaSalle Street, Suite 2600
Chicago, IL  60601
(312) 609-7500
cottenweller@vedderprice.com

Thomas R. Dee*
Alex C. Weinstein*
VEDDER PRICE P.C.
222 North LaSalle Street, Suite 2600
Chicago, IL  60601
(312) 609-7500
tdee@vedderprice.com
aweinstein@vedderprice.com
*pro hac vice forthcoming*

*Counsel for Matrix North American Construction, Inc.*